# Exhibit A

U.S. DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA

| | |
|---|---|
| ADAM LAMPARELLO,<br><br>PLAINTIFF<br><br>vs.<br><br>CATHY COX, in her official and personal capacity, BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA, T. DALLAS SMITH, in his official capacity, HOLLEY ROBERTS, in her official capacity, KARIN ELLIOTT, in her official capacity, INDIREN PILLAY, in his official and personal capacity, and AMY PHILLIPS, in her official and personal capacity.<br><br>DEFENDANTS. | Civil Case No. 5:25-cv-00469-MTT |

**SECOND AMENDED COMPLAINT AND JURY DEMAND**

1. Plaintiff Adam Lamparello is a former tenure-track professor of Georgia College and State University and sues to vindicate his rights after Defendants, acting in both their official and personal capacities, violated his First and Fourteenth Amendment rights under the United States Constitution, as applied through 42 USC § 1983. In addition, he sues for breach of contract as a supplemental state-law claim.

## I. Parties

### A. Defendants

2. T. Dallas Smith is acting Chair of the Board of Regents of the University System of Georgia ("USG"), which has its primary place of business and headquarters at 270 Washington St., Southwest, Atlanta, Georgia. In his official capacity, Smith is a state actor, and the Georgia Constitution grants the Board of Regents of which he is chair the exclusive right to

govern, control, and manage the USG and all USG institutions, including Georgia College and State University. Mr. Smith is a resident of Georgia.

3. Holley Roberts is the Provost and Vice President for Academic Affairs at Georgia College and State University. In this official capacity, she is in charge of managing faculty and academic programs. She is directly responsible for implementing President Cox's policies suppressing free speech in the name of the university's "image." At all relevant times she had direct authority and directly participated in the decision to terminate Plaintiff's employment due to his protected speech. Provost and Vice President Roberts operates in her official capacity as a state actor. She resides in Georgia.

4. Karin Elliott is Vice Chancellor of Human Resources of the University System of Georgia primary place of business and headquarters at 270 Washington St., Southwest, Atlanta, Georgia, and as such, she exerts direct supervision and authority over so-called "human resources" decisions at Georgia College and State University, including but not limited to direct supervision of the decision to terminate Plaintiff for his protected speech. As Vice Chancellor of Human Resources, Elliott operates in her official capacity as a state actor. She resides in Georgia.

5. Defendants Smith, Roberts, and Elliott will hereafter be referred to as the "Official Capacity Defendants."

6. Cathy Cox is acting President of Georgia College and State University, and as such answers directly to the Board of Regents. At all relevant times, she had direct authority over and directly participated in the decision to terminate Plaintiff's employment due to his protected speech. President Cox operates in her official capacity as a state actor. She resides in Georgia.

7. Indiren Pillay has served since January 1, 2025 as Interim Dean of the College of Arts and Sciences at Georgia College and State University, in which he participated directly in the decision to terminate Plaintiff's employment due to his protected speech. As Interim Dean, Defendant Pillay directly supervised Professor Lamparello but expressed more concern with the "image" of Georgia College and State University rather than the protected speech of an accomplished and outstanding faculty member. Defendant Pillay participated directly in the July 1, 2025 "Human Resources" meeting in which Professor Lamparello was terminated for his protected speech. Defendant Pillay punishes outstanding teachers for speaking out on matters of public concern. Interim Dean Pillay operates in his official capacity as a state actor. He resides in Georgia.

8. Amy Phillips is Interim Chief Human Resources Officer of Georgia College and State University and participated directly in the decision to terminate Plaintiff's employment due to his protected speech. Interim Chief Phillips operates in her official capacity as a state actor. She resides in Georgia.

9. Defendants Cox, Pillay, and Phillips will hereafter be referred to collectively as the "Individual Capacity Defendants."

10. Defendant Board of Regents of the University System of Georgia is a body corporate created under the Constitution and laws of the State of Georgia. The Board of Regents is the governing authority for the University System of Georgia, which includes Georgia College and State University, Plaintiff's employer. The Board of Regents exercises control over Georgia College and State University, including its policies, operations, and personnel decisions. The Board of Regents may be served at its principal office located at 270 Washington Street, S.W., Atlanta, Georgia 30334.

**B. Plaintiff Adam Lamparello**

11. Adam Lamparello was, until his illegal termination, a tenure-track Assistant Professor of Public Law, Mock Trial coach, and Pre-Law Advisor at Georgia College and State University. Professor Lamparello resides in New Jersey.

12. Professor Lamparello joined Georgia College and State University's Department of Government and Sociology during the COVID year of 2020. Although the global pandemic had a negative impact on all educational institutions throughout the United States, Professor Lamparello immediately excelled.

13. He taught numerous introductory courses, including Introduction to Law, Introduction to Criminal Justice, Constitutional Law II, American Judicial Systems, Legal Research and Writing, and Ethics, and also served as the mock trial coach and pre-law advisor, where he assisted countless students in applying to law school, drafting personal statements, and preparing for the Law School Admissions Test. He also served on Georgia College and State University's Senate and contributed to the University's Curriculum Committee and Academic Policy Committee.

14. In the fall of 2021, Georgia College and State University's Center for Teaching & Learning established a "Thank-a-Teacher" Award, which recognizes teachers who have created transformative learning experiences for their students. The nomination process is entirely driven by student initiative.

15. Over the eight semesters since the program began, students recognized Professor Lamparello with a Thank-a-Teacher Award every single semester except one (fall 2024), including as recently as the spring semester of 2025.[1]

---

[1] See https://www.gcsu.edu/ctl/thank-a-teacher.

16. Professor Lamparello has received 16 such awards in total.

17. When, in 2024, Professor Lamparello's academic department recognized him with its "Excellence in Teaching" award, Dr. Scott Buchanan, Professor Lamparello's immediate supervisor, stated Professor Lamparello had not received a single negative student evaluation, and that it would take "hours" to describe the positive evaluations Professor Lamparello received at Georgia College and State University.

18. Professor Lamparello's record of scholarship is equally superlative. Professor Lamparello has over 65 scholarly publications, including four co-authored books. He has contributed chapters to scholarly volumes, and published in the law journals of Harvard University, Columbia University, Northwestern University, University of Pennsylvania, University of Texas, and Fordham University, among many others.

19. This is the professor whom Georgia College and State University now claims somehow reflects so poorly on the institution's "image."

20. By comparison, Defendant President Cox, who holds herself out as an educator and expert in the law (having earned a JD and once served on a law review, apparently as a student), has published no scholarship of any note and none of any reputation.[2]

## II. Jurisdiction and Venue

21. Jurisdiction is proper under 28 USC § 1331 because Plaintiff brings a cause of action under 42 USC § 1983 for the infringement of his rights under the First Amendment to the Constitution of the United States.

---

[2] See https://www.gcsu.edu/president/biography

22. Jurisdiction is also proper under 28 USC § 1332 because there is complete diversity among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

23. This Court may exercise supplemental jurisdiction over all state-law claims under 28 USC § 1367(a).

24. Venue is proper in the Middle District of Georgia under 28 USC 1391(b) because the University System of Georgia has its chief place of business operations and headquarters in Atlanta, Georgia within the jurisdiction of this Court.

## III. Facts

### C. Professor Lamparello Discovers Plagiarism

25. In February 2025, Professor Lamparello was teaching a course titled the American Judicial Systems at Georgia College and State University. The class required students to draft various legal documents, and students were placed in groups to complete the assignments.

26. Professor Lamparello discovered that the students in one of the groups committed plagiarism. In fact, they even copied a portion of a legal brief written by opposing counsel in a successful wrongful death lawsuit Professor Lamparello brought that involved his brother’s tragic suicide.

27. Multiple incidents of plagiarism continued through April 2025.

28. The students Student, Student, Student, Student, and Student plagiarized a portion of a complaint, a legal memorandum, a draft of their summary judgment brief, and then followed up by plagiarizing their final summary judgment brief due at the end of the semester.

29. Under USG and Georgia College and State University policies, a professor who uncovers "academic dishonesty" must report it. Specifically, "Faculty members must report all violations of the Academic Honor Code to the Dean of Students."[3]

30. Georgia College and State University did nothing.

31. Yet after Professor Lamparello did his duty, one of the cheating students retaliated. In particular, Student , who on multiple occasions begged Professor Lamparello for grade increases and cried when she did not receive a grade she believed she deserved, falsely complained of Professor Lamparello's "unprofessionalism," alleging he never gave them feedback, graded inconsistently, and treated her "unfairly." None of this was true, as the students later admitted.

32. Despite the fact that the students had committed plagiarism, Defendants coddled the students. The students who had cheated went undisciplined.

33. In April 2025, the Department of Government and Sociology awarded Professor Lamparello its Excellence in Teaching Award. Yet Defendants launched an investigation, not of the students, but of Professor Lamparello.

34. This incident exemplified a pattern, practice, and culture at Georgia College and State University: Professors are investigated and punished for upholding academic rigor and integrity. Students are rewarded for making false allegations with impunity.

35. Under Defendant Cathy Cox's leadership, the university operates on the unspoken motto that no students' subjective feelings may be left behind, and that "image" and "retention" matter more than academic rigor and integrity.

---

[3] https://www.gcsu.edu/deanofstudents/student-code-of-conduct

36. During this time, Georgia College and State University also began to monitor Professor Lamparello's online activity extensively.

**D. Professor Lamparello Exercises His First Amendment Right**

37. Understandably discouraged by the University's failure to address repeated incidents of plagiarism, Professor Lamparello turned for advice to a listserv on which he had participated for years.

38. The listserv is run by the Legal Writing Institute Community ("LWIC"), the largest organization of legal writing professionals in the world. LWIC has thousands of members from educational institutions as well as practicing attorneys, not only in the United States but also abroad. Its members are dedicated to teaching legal writing and sharing their experiences as professionals.

39. LWIC has no affiliation with University System of Georgia in general or Georgia College and State University in particular.

40. The community of the listserv is unmoderated. LWIC is open to any professional teacher of legal writing.

41. Professor Lamparello participated in LWIC under his own private email address.

42. Professor Lamparello did not use his official email of Georgia College and State University when participating on LWIC.

43. On May 29, 2025, Professor Lamparello posted the following query to his colleagues dedicated to legal writing throughout the English-speaking world:

> Advice -- Difficult Students
>
> Hi everyone,
>
> I currently teach undergraduate law courses at Georgia College, and many of my students intend to apply to law school. The semester just ended, and it has been the most difficult academic year I've experienced in fourteen years of teaching.

Case 5:25-cv-00469-MTT Document 1-4 Filed 12/10/25 Page 10 of 33

> Over the past several semesters, I've noticed that students have become more entitled and lack any sense of accountability. Nearly half of my students plagiarized one or more of the assignments. Others routinely pleaded for grade increases or assignment do-overs and often cried when receiving feedback they didn't like. Attendance has also been an issue, and I get excuses such as "I'm not coming to class because I just stopped vaping," or "I had a long night, so I can't make it."
>
> I've tried my best to help them and been flexible and supportive, but the lack of engagement, respect, and fragility is exhausting. In the final class, I addressed the issue directly and told them that such behavior won't serve them well in law school or other professional settings. Well, several students became visibly upset and filed complaints, though no formal action was taken. I have never seen anything like this.
>
> I'm reaching out to ask: Have you seen similar trends? How do you deal with it? I'm truly questioning whether I want to continue teaching and would appreciate any advice you can give. Thanks very much.
>
> Adam

44. Professor Lamparello, after years of dedicated service to the students and citizens of Georgia, was understandably anguished that coddled and self-entitled students were undermining the educational experience of others.

45. Shortly thereafter, on July 1, 2025, despite five years of exemplary student evaluations, supervisor reviews, numerous teaching awards both from his department and from students, as well as a pre-tenure review in which his Department chair singled out Professor Lamparello's performance as "exceeding expectations" in teaching, scholarship, service, and student success, the Defendants fired him.

46. Ironically, Defendants expressed no concern that Georgia College and State University was launching unprepared, over-entitled, and coddled students into the dynamic economy of the state of Georgia, where they will surely fail.

47. Instead, the Defendants issued a termination notice revoking Mr. Lamparello's status as a tenure-track Professor and indicating that the current academic year would be his last.

48. As became clear, Defendants were more concerned with an "unbecoming image of the university" than with holding students accountable for serious misconduct or training them with marketable skills. Unfortunately, Professor Lamparello's honest comments, which he made in his capacity as a private citizen on a matter of public concern, had offended Defendants' subjective sense of "image." And that was enough.

### E. The Unnoticed July 1, 2025 "Human Resources" Meeting with Defendant Phillips and Defendant Pillay

49. Defendants' determination to terminate Professor Lamparello proceeded as follows:

50. On June 30, 2025, at 7:30 a.m., Professor Lamparello received an email from the University's registrar that an investigation had been conducted without his knowledge or notification of the complaint against him, or any knowledge of the evidence against him, or any opportunity to be heard. The so-called "investigation" had concluded that he had violated the Federal Educational Rights and Privacy Act (FERPA), which he had not.

51. On information and belief, the registrar's office of Georgia College and State University is not responsible for conducting any such investigations.

52. The Registrar advised Professor Lamparello to review the University's FERPA policies to avoid future violations. However, the registrar did not indicate that Professor Lamparello was otherwise subjected to discipline.

53. Alarmed that an investigation had occurred without affording him any notice or opportunity to know the evidence against him or to respond, Professor Lamparello sent the Registrar a message disputing the allegations, which he had only then learned about for the first time.

54. Exactly one hour later on the same day, at 8:32 a.m., Defendant Phillips, the Interim Chief "Human Resources" Officer emailed Professor Lamparello.

55. Defendant Phillips requested to meet Professor Lamparello immediately. A meeting was scheduled for 8:30 a.m. the next day. Even then, Professor Lamparello was not notified of any allegations or accusations against him. Professor Lamparello reasonably assumed that the meeting would address the contrived FERPA accusations.

56. The next morning, Professor Lamparello was called before Defendant Phillips and Pillay at 8:30 a.m. and ambushed with entirely new and never before mentioned allegations—that his post to the LWIC listserv, which was protected speech by a private citizen on a matter of public concern, created an "unbecoming look" for President Cox and the university.

57. Apparently under President Cox's leadership, the university's image had become so fragile that a frank discussion among professors concerning the lamentable coddling of entitled students caused her and the university's leadership severe distress.

58. Simply put, Professor Lamparello was, without any notice whatsoever, called to answer for exercising his First Amendment rights.

59. The meeting was, an HR ambush interview of the kind that has become typical in academic institutions over the last decade with the ascendance of "Human Resources," and that occurs without even the pretense of due process.

60. Defendant Phillips quickly made clear that her meeting with Professor Lamparello was substantially motivated by his LWIC listserv post. She let off the interrogation:

> So Professor Lamparello, I do have an email that has been provided to me that appears to be authored by you and sent to a listserv called the Leading Legal Writing Institute [sic.], dated May 29, with a subject line of "Difficult Students: Advice for Difficult Students."

"Is this something you recall sending?" she then asked.

61. Professor Lamparello was stunned that he was being asked to discuss an ordinary email to a private professional listserv of legal writing experts.

62. Of course, when an outstanding, award-winning professor expresses anguish and discouragement because of over-entitled students and student misconduct the more usual response at an institution of higher education is to question why the institution ‘s administrative practices encourage disrespectful and dishonest behavior among its students.

63. This was never Defendants’ approach.

64. Rather, Professor Lamparello’s exercise of his First Amendment rights was the only “problem” they wished to address.

65. “Investigator” Phillips observed that “Georgia College students intend to apply to law school,” and asked if Professor Lamparello had “described them as being entitled, lacking accountability, stating that nearly half of the students have plagiarized, and describing them as having a lack of engagement, respect, and being fragile to the point that exhausts you?”

66. Professor Lamparello explained that his message to the LWIC listserve sought professional advice from peers because of pervasive student misconduct, and that he did not mention any students or make any disparaging remarks about any student or the university.

67. This did not matter to Defendants.

68. Ordinarily, a leading state institution operating under the largess of Georgia’s taxpayers would or should be concerned that it is producing ill equipped adults for a competitive, dynamic job market. But, again, not so at Georgia College and State University under Defendants’ leadership.

69. Phillips asked, “Did you consider that [the email] might negatively impact the students here at GCSU who are applying to law schools?” Whether over-entitled, cheating

students were actually qualified to become the next generation of Georgia lawyers; this was a question that did not appear to have occurred to her or to any of the Defendants.

70. Phillips expressed no concern that several of Professor Lamparello's students had plagiarized multiple assignments or made false allegations against him. Furthermore, the idea that ill-prepared and over entitled students might fail in law school (and beyond) seems to never have occurred to Defendants.

71. Instead, Phillips then alleged, "… those law schools might be participating in the listserv you sent it on," in apparent consternation. Phillips continued to show no understanding for the fact that Professor Lamparello spoke in his capacity as a private citizen and on a matter of public concern.

72. Professor Lamparello's inquisitors eventually shared that a "colleague from a law school out of state"—not anyone affiliated with Georgia College and State University — who had provided Professor Lamparello's listserv post to Defendant Cox. As the meeting continued, there was no interest in addressing the troubling academic dishonesty and over-entitlement that Professor Lamparello identified. The meeting continued to focus on the "image" of President Cox and the university of that a frank discussion of teaching supposedly harmed.

73. Phillips further stated, "That individual [informant] . . . had concerns about how this reflects on Georgia College and on students applying to law school. That [unnamed] individual felt it was inappropriate. Likewise, President Cox *has had conversations with me about how that email presents an inappropriate and unbecoming image of the university*." (emphasis added).

74. Bizarrely, the faculty at Georgia College and State University have routinely opined on social media and elsewhere that there students are "babies," and even described

President Trump as a "rapist" and "Nazi." Professor Lamparello's legitimate concerns about over-entitled, ill-prepared, and cheating students are hardly incendiary by comparison.

75. Any "unbecoming image" the public may have of Georgia College and State University would be affected far more by Defendants' harassment of its most capable faculty, its coddling of its most incapable and mendacious students, and its decision to ignore serious student misconduct that did not stop short of false and defamatory accusations against professors.

76. This practice in academia is a matter of widespread public concern. It is demonstrated by the publications of Jonathan Haidt, Nicholas Wolfinger, George Lukianoff, Glenn Loury, and many other public intellectuals, let alone a lively discussion on the LWIC listserv that followed Professor Lamparello's post.

77. Although Professor Lamparello's LWIC listserve post never identified any student with personal identifying information or any details that could be traced back to a specific student, Defendants Phillips and Pillay also accused Professor Lamparello of violating the Family Educational Rights and Privacy Act.

78. Although Defendant Phillips admitted that whatever "FERPA" investigation there was had not yet concluded, and, "I am not a FERPA expert, but I am trained annually." She added, "[t]he FERPA violation *itself and whether or not it happened* is for our FERPA officer who is the registrar here at Georgia College." (emphasis added).

79. Thus, whatever the substance of the FERPA "investigation," it could not have possibly been the basis for any adverse employment action against Professor Lamparello.

80. There was no pretext of an "investigation" and no regard given to even the most basic due process safeguards. There was only Defendants' diktat, which was stated immediately after the discussion of Professor Lamparello's protected speech: "Ultimately, we're letting you

know that your 2025–26 contract is on hold status, pending review of these items under BOR Policy §8.2.18 (Core Values and Code of Conduct), and Georgia College policies on academic professionalism."

81. The truth is that before the HR meeting was scheduled, the conclusion to terminate Professor Lamparello was already made in retaliation for his constitutionally protected speech.

82. In the next breath Defendant Phillips declared, "Based on what's been shared, it's the intent of President Cox and Dr. Roberts to issue a terminal contract — your final contract for the upcoming year." That is, Professor Lamparello could finish out the year, but was cancelled from the tenure track and told this year would be his last.

83. Professor Lamparello had been fired within the space of a 13-minute meeting in which he was given no notice about the "allegations" against him, no notice of any prior "investigations" that had occurred, and no opportunity to meaningfully respond.

84. This came as a shock to Professor Lamparello because, during each of the five previous years, he had received exemplary student evaluations and outstanding annual reviews from his supervisor, Dr. Scott Buchanan. He also received a teaching award from his department and numerous "Thank-A-Teacher" awards, spontaneously initiated by students. He had guided the university's mock trial teams to multiple victories, over a dozen awards, and even national recognition. In fact, Professor Lamparello's professional annual evaluation only two months before Defendants' HR ambush concluded: "I did want to mention to you that you are eligible to go up for tenure and promotion to associate professor in Fall 2025. Thank you for all of your hard work, Adam."

85. In sum, in April, Professor Lamparello received the Department of Government and Sociology's Excellence in Teaching Award. In July, he was fired for his speech, and his career was ruined.

**F. Professor Lamparello's Exemplary Record of Service to the Students of Georgia**

86. Professor Lamparello earned his Bachelor of Arts, *magna cum laude*, at the University of Southern California in 1997.

87. Professor Lamparello then earned his JD at the Ohio State University College of Law, graduating with honors in 2001. He also won an award for legal scholarship and served as Associate Editor of the Ohio State Journal on Dispute Resolution.

88. Professor Lamparello went on to earn an LLM degree from New York University School of Law, graduating in 2006. There he served as Graduate Editor of the New York University Journal of Law and Liberty.

89. After this, Professor Lamparello earned a Master of Science degree in criminology and criminal justice from the University of Alabama, where he earned a scholarship and graduated in 2019.

90. After earning his LLM, Professor Lamparello began teaching as a Westerfield Fellow at Loyola University College of Law in New Orleans. There he taught legal analysis, legal research and writing, and a constitutional law seminar from 2007 to 2011. He also served as faculty advisor to Loyola's Law and Technology Journal and taught in Loyola's moot court program. During his four years at Loyola, Professor Lamparello's student evaluations were exemplary. Many students described Professor Lamparello as the best professor they had at the law school.

91. Professor Lamparello then served as a Visiting Associate Professor of Law at the Walter F. George School of Law at Mercer University in Macon, Georgia for one academic year

(2011-2012). In that capacity, Professor Lamparello's student evaluations were similarly exemplary.

92. Professor Lamparello went on from there to the Indiana Institute of Technology Law School, where he joined the faculty in 2013 as an Assistant Professor of Law and later became the Associate Dean for Experiential Learning and Associate Professor of Law.

93. At Indiana Tech, Professor Lamparello designed and implemented an integrated, cross-curricular model for first-year and upper-level courses, involving students in mock litigation exercises as well as transactional legal work that prepared them for the real-world practice of law. The Wisconsin Law Review recognized Professor Lamparello's cross-curricular model as one of the "best models for skills integration throughout the curriculum" in law schools throughout the United States. In 2015, Professor Lamparello received the annual award for Outstanding Service to Indiana Tech Law School.

94. Among other service to students, Professor Lamparello cofounded Indiana Tech's Legal Writing Center, which provided individualized, out-of-class instruction to law students on a weekly basis. He also helped found the law school's Supreme Court Amicus Project, which involved students in legal research and in drafting amicus briefs for parties with cases pending before the United States Supreme Court, especially concerning fundamental constitutional rights (of the kind that Georgia College and State University now violates).

95. Thus, for over a decade prior to joining the faculty at Georgia College and State University, Professor Lamparello distinguished himself in all aspects of law school teaching, advising, program development, scholarship, and administration.

**G. Professor Lamparello Wins a Tenure-Track Appointment in Recognition of Outstanding Teaching, Scholarship, and Service**

96. Professor Lamparello's first position at Georgia College and State University was as a Limited Term Lecturer, which entailed a one-year contract with no guarantee of renewal. A Limited Term Lecturer has no promise of tenure or a tenure-track position, no matter how well he performed in the classroom, in his scholarship, or in his service to the University.

97. Professor Lamparello's teaching stood out so much that, after his 2021 evaluation, his department (Government and Sociology) promoted him to a tenure-track Professor position. In other words, although he remained an assistant professor, he had now earned the potential to achieve tenure and with it, job security.

98. Professor Lamparello was scheduled to go up for promotion to associate professor with tenure in the coming fall semester 2025.

99. But for Defendants' retaliation against Professor Lamparello for his exercise of protected speech as a citizen on matters of public concern, there is no doubt he would have earned tenure.

100. In fact, his Department Chair wrote in a performance evaluation of March 14, 2025:

> You have some of the highest student evaluation submission rates in the Department. Overall, your quantitative rankings are very high, and the student qualitative comments are all extremely positive. *Indeed, I did not see any negative comments across all of your 2024 courses.* Of all faculty in the Department, you had the most students leave qualitative feedback. In my mind, this is testament to the enthusiasm you have for the subject matter, and that enthusiasm is obviously infectious. *The students appreciate what you do for them.* (Emphasis added.)

101. Yet under the "leadership" of President Cox and Defendant Provost Holley Roberts and the harassment of the so-called "Human Resources" department led by Defendant

Karin Elliott as implemented by Defendant Amy Phillips at Georgia College and State University, effective teaching is never enough.

102. Professor Lamparello was also required to have the correct viewpoints and opinions that reflected on their "image." Specifically, he was required not to say anything in public that President Cox might find embarrassing to her or the institution.

103. By 2025, Professor Lamparello was an award-winning professor who was beloved by his students and respected by his peers.

104. But evidence, most especially evidence of inspiring teaching, did not matter to Defendants and Georgia College and State University's "Human Resources" department.

105. HR also did not care about the learning experience of Professor Lamparello's other students, who described Professor Lamparello as "life-changing," "inspiring," and "transformative." Defendants and HR undercut those students by amplifying the bad-faith complaints of the most over-entitled, lazy, unproductive, and disruptive students.

106. Defendants interfered with Professor Lamparello's academic standards and academic freedom repeatedly, which were expressly protected by USG's rules and policies. Georgia College and State University refused to discipline students that Professor Lamparello reported for ***repeated*** plagiarism.

107. To Defendants, it was more important to protect the school's "image" than to teach students subject matter mastery and prepare students as competent professionals for the dynamic economy of Georgia.

**H. Georgia College and State University Policies**

108. USG's Academic Freedom Policy (Board of Regents Policy Manual, §6.5.1) states:

As a public system of higher education, USG is committed to protecting the academic freedom rights of faculty and students in teaching, research, publishing, and other academic activities. All institutions within USG must vigorously promote the open exchange of ideas and protect academic freedom on their campuses.

USG values diversity of intellectual thought and expression for all. While faculty and students must be encouraged to exercise their rights to academic freedom, they must also understand that, along with those rights comes the responsibility to respect the individuality and beliefs of all. Members of the USG community should always seek to foster and defend intellectual honesty, freedom of inquiry, and instruction on and off campus.

Academic freedom is a bedrock of higher education, but it is not unlimited. Faculty academic freedom extends only to classroom material and discussions, research, publications, and other academic activities that are germane to the subject matter being taught, researched, written about, or presented. Faculty members must be careful not to introduce into their teaching controversial matters that have no relation to their subject.

Students should be provided an environment conducive to learning, be free from faculty or institutional coercion to make personal political or social choices, and be evaluated based on their academic performance, not factors that are irrelevant to that performance such as their personal beliefs. Similarly, faculty and staff have the right to be unburdened by irrelevant factors such as ideological tests, affirmations, and oaths, and should instead be hired and evaluated based on relevant factors such as their achievement and the success of students.

Finally, faculty hold a special position in the community that carries both privileges and obligations. Because faculty are scholars and educators, the public may judge their profession and their institutions by their utterances. Therefore, faculty should always strive to be accurate, exercise appropriate restraint, show respect for the opinions of others, and make every effort when they are expressing their personal opinions to indicate that they are speaking for themselves as private citizens rather than on behalf of their institutions.

This commitment to protecting the academic freedom rights of all faculty and students, as well as ensuring that all faculty and students respect the academic freedom rights of others, is crucial to USG's mission of providing the best educational opportunities to all Georgians.

109. Georgia College and State University publishes its own Freedom of Expression Policy which conforms to USG's broader mandate protecting freedom of expression academic freedom.[4]

110. Nowhere do these policies provide for restrictions on academic freedom because of "power dynamics" or "image," whether real or imaginary as defined by HR bureaucrats who have no understanding or training in the academic disciplines being taught.

111. Similarly, USG's Institution Freedom of Expression Policies (Board Of Regents Policy Manual, § 6.5.2) provides:

> As public institutions of higher education, USG institutions must promote free expression and academic freedom on their campuses. . . . While institutions may need to enact policies to promote campus safety, to ensure the proper functioning of the academic environment and institution activities, or to further other important institution objectives, those policies should not unduly burden the free expression rights of students, faculty, and staff.
>
> [. . .]
>
> Institutions can designate accessible, high-traffic locations on campus as public forum areas for individuals or groups who are not members of the campus community and can require these individuals or groups to comply with reasonable time, place, and manner restrictions, including reservation requirements. Institutions may not consider the content or viewpoint of expression when requiring or assigning use of public forum areas.
>
> [. . .]
>
> No institution orientation or training for students or employees may include ideological tests, affirmations, or oaths, including diversity statements.

112. Nowhere does USG' forbid professors from seeking forums for discussion among professors from their peer institutions or restrict them from voicing concerns about the quality of education provided by Georgia College and State University, much less saying something that

---

[4] Available here https://gcsu.smartcatalogiq.com/en/policy-manual/policy-manual/campus-affairs/freedom-of-expression-policy/

might injure President Cox's or others' fragile subjective interpretation of their or the institutions' "image."

113. The Board of Regents of the USG, of which Defendant Smith is Chair, has also promulgated a detailed policy for the Discipline and Removal of Faculty Members.

114. This is policy 8.3.9 of the Board of Regents.

115. The Board of Regents, exercising its plenary authority to regulate all institutions of higher education maintained by the taxpayers of Georgia, mandates that even a "non-tenured faculty member" can only be terminated "provided that the institution [here, Georgia College and State University] has complied with procedural due process requirements."

116. Even for non-tenured faculty members during his or her contract term, "Preliminary Procedures" must include:

> 1. Discussion between the faculty member and appropriate administrative officers looking toward a mutual settlement.
>
> 2. Informal inquiry by an appropriate faculty committee which may, upon failing to effect an adjustment, advise the President whether dismissal proceedings should be undertaken, though the advisory opinion shall not be binding upon the President.
>
> 3. A letter to the faculty member forewarning that he or she is about to be terminated for cause and informing him or her that a statement of charges will be forwarded to him or her upon request. The faculty member may request a formal hearing on the charges before a faculty committee. Failure to request charges or a hearing within a reasonable time shall constitute a waiver of the right to a hearing.
>
> 4. A statement of charges, if requested by the faculty member, framed with reasonable particularity by the President or his or her designee. Along with the charges, the faculty member shall be advised of the names of the witnesses to be used against him or her together with the nature of their expected testimony.

117. In Defendants' zeal to suppress the First Amendment of United States Constitution, Defendants followed none of these procedures.

118. Additionally, Georgia College and State University issued a policy for progressive discipline, called the "Prohibitions and Penalties policy.[5]"

119. Nowhere does the Prohibitions and Penalties Policy provide for any punishment for speaking as a private citizen on matters of public concern, regardless of whether this proves embarrassing to Georgia College and State University.

120. The Prohibitions and Penalties Policy provides that discipline should follow a progressive sequence starting with a "letter of direction" establishing "expectations," through verbal and written warnings, a "Final Written Warning," and finally "Suspension," and "Recommended for Termination."

121. None of these steps were taken in Professor Lamparello's case.

122. Furthermore, nowhere does the Prohibitions and Penalties Policy provide for any punishment simply because a faculty member hurts the "image" of President Cathy Cox or, in her view, tarnishes the "image" of Georgia College and State University.

## I. Georgia College and State University Breaches Its Contracts and Policies with Professor Lamparello

123. In Georgia, the policies, manuals, and handbooks of a state college or university constitute contractual obligations.

124. All contracts extended to Plaintiff incorporated by reference the policies, manuals, and handbooks of Georgia College and State University and of the USG.

---

[5] Available at https://www.gcsu.edu/sites/files/page-assets/node-716/attachments/gcsu_prohibitions_and_penalties_updated_2018_02_14.pdf; and https://gcsu.smartcatalogiq.com/policy-manual/policy-manual/division-of-finance-and-administration/plant-operations/0702-facilities-operations-procedures/disciplinary-action/content-section

125. Defendant Smith was notified repeatedly by Plaintiff of Defendants' violation of Georgia College and State University's policies and of the First Amendment to United States Constitution.

126. Defendant Smith disregarded his duties and obligations and did nothing.

127. The Board of Regents, under the leadership of Defendant Smith, requires: "Each institution should provide for standards governing faculty conduct, including sanctions short of dismissal and procedures for implementing such sanctions."[6]

128. By contrast, even endangering fellow employees or the public through one's own negligence, which writing on a listserv of legal writing professors certainly did not, would warrant only a level 1 disciplinary recommendation, i.e. "Verbal Warning."[7]

129. Yet Defendants are so fragile that their exposure, even among a specialized community of legal-writing professionals, as coddling over-entitled students caused them to panic, deviate from all established policies and principles, and terminate Plaintiff.

## IV. Causes of Action

**<u>COUNT 1:</u> First Amendment Retaliation under 42 USC § 1983**
**(against all Official Capacity Defendants in their official capacities and all Individual Capacity Defendants in their individual and official capacities)**

130. Plaintiff here incorporates by reference all preceding paragraphs as if fully set forth in this paragraph.

131. The First Amendment to United States Constitution provides in relevant part:

> Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble. . .

---

[6] University system of Georgia, Board of Regents Policy Manual, § 8.3.9.1, available at https://www.usg.edu/policymanual/section8/policy/8.3_additional_policies_for_faculty and implemented at Georgia College and State University's "Human Resources" department through its "Prohibitions and Penalties Progressive Discipline Guide" at 2.
[7] Id. at 3, § B.5.

132. The Fourteenth Amendment to the United States Constitution makes the First Amendment applicable against the states. And 42 USC § 1983 provides for a private right of action to enforce these rights against state actors such as Defendants.

133. Georgia College and State University is an arm of the state of Georgia.

134. All Defendants are state actors acting under the color of state law with regard to all acts and omissions set forth in this Complaint.

135. Plaintiff exercised his right to speak publicly, in particular, but not limited to his classroom speech within the scope of his teaching and his post on a listserv shared with thousands of law professors dedicated to teaching legal writing.

136. With regard to his use of LWIC listserv, Plaintiff did not use the listserv within the scope of his employment but as a citizen sharing his concerns with other citizens on LWIC.

137. In all cases, Plaintiff's public speech was on a matter of public concern, in particular the tendency of educational institutions and administrators such as President Cathy Cox to coddle students rather than teach them subject-matter mastery and meaningful skills for their future careers and obligations as citizens.

138. Defendants retaliated against Plaintiff by stripping his tenure-track status and issuing a terminal year contract. This was a material change to Plaintiff's conditions of employment and constituted an adverse employment action.

139. Each of the Individual and Official Capacity Defendants participated directly or indirectly in the First Amendment retaliation against Professor Lamparello.

140. Defendant T. Dallas Smith is Chair of the Board of Regents of the University System of Georgia, and the Office of Legal Affairs at the University System of Georgia received numerous memorandums and messages from Professor Lamparello informing them of his

grievance that his First Amendment rights were being violated due to nothing more than the vanity and fragility of President Cox and her phalanx of HR administrators. The Office of Legal Affairs did nothing and shirked its responsibility to ensure that the officers of Georgia College and State University abide by the institution's rules and policies and the law of the United States and Georgia. Professor Lamparello also filed numerous complaints with HR, none of which were investigated.

141. Defendant Cathy Cox is the chief executive officer of Georgia College and State University as its acting President. She is quoted by one of her phalanx of HR administrators, Defendant Phillips, as directing the termination of Professor Lamparello because of his protected speech. Rather than uphold an excellent, award-winning professor and ensuring education performance, Defendant Cox demonstrated more concern with the "unbecoming image of the university" supposedly created by his protected speech.

142. In short, because Professor Lamparello's protected speech supposedly hurt the "image" of Georgia College and State University, Defendants fired him.

143. Defendant Holley Roberts is the chief operating officer of Georgia College and State University as its Interim Provost. As Vice President for Academic Affairs she manages faculty and academic programs. She is directly responsible for implementing President Cox's policies suppressing free speech in the name of the university's "image." Rather than bolstering Georgia College and State University's academic programs such that they teach subject-matter mastery and prepare the students of the taxpayers of Georgia for meaningful careers and their roles as citizens, Defendant Roberts would rather punish outstanding teachers for speaking out on matters of public concern. Defendant Roberts was directly involved in terminating Professor Lamparello due to his protected speech.

144. Defendant Indiren Pillay has served throughout 2025 as Interim Dean of the College of Arts and Sciences at Georgia College and State University. As Interim Dean, Defendant Pillay directly supervised Professor Lamparello. Defendant Pillay participated directly in the July 1, 2025 "Human Resources" meeting in which Professor Lamparello was terminated for his protected speech.

145. Defendant Karin Elliott is directly responsible for all so-called "Human Resources" decisions and directly supervises the so-called "Human Resources" office at Georgia College and State University. She directly participated in and approved the suppression of Professor Lamparello's protected speech. She did so in the name of shielding Georgia College and State University from the embarrassment of having one of its professors collaborate with members of his profession to teach students subject-matter mastery rather than coddling them.

146. Defendant Amy Phillips participated directly in the decision to terminate Plaintiff's employment and was a direct participant in the July 1, 2025 "Human Resources" meeting. She informed Professor Lamparello, "President Cox has had conversations with me about how that email [e.g., protected speech] presents an inappropriate and unbecoming image of the university." Apparently because President Cox felt that Professor Lamparello's email hurt her or Georgia College and State University's "image," Defendant Phillips informed Professor Lamparello he had to be fired.

147. Professor Lamparello has suffered damages. Defendants ended his outstanding academic career as an inspiring teacher.

148. Indeed, it is the students, predominantly Georgia citizens, and the taxpayers of Georgia, who suffer the most from this suppression of professors' constitutional right to speak freely on matters of public concern. But Defendants trample these rights with impunity.

149. Professor Lamparello is entitled to all compensatory damages in an amount to be determined at trial as well as prospective injunctive relief, including but not limited to reinstatement.

150. Defendants' suppression of Professor Lamparello's First Amendment rights were intentional, willful, and malicious. Even if Professor Lamparello were to recover only nominal damages, he is therefore entitled to punitive damages due to the reprehensible nature of Defendants' conduct.

**<u>COUNT 2:</u> Due Process Violation under the Fourteenth Amendment to United States Constitution As Applied through 42 USC § 1983**
**(All Individual Defendants)**

151. Plaintiff here incorporates by reference all preceding paragraphs as if fully set forth in this paragraph.

152. Plaintiff Professor Lamparello had a property right in his tenure-track position.

153. Section 1 of the Fourteenth Amendment to the United States Constitution provides that "[no] state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

154. Because USG purports to abide by its obligation to uphold faculty-member due process rights, it has even guaranteed due process in its Board of Regents policies, specifically Board of Regents Policy 8.3.9.

155. Defendants are all state actors.

156. Defendants deprived Professor Lamparello of his due process rights by, without limitation, failing to provide any notice of the charges against him prior to reaching a decision, failing to provide the evidence against him prior to reaching a decision, and failing to provide Professor Lamparello a meaningful hearing before an unbiased decision maker.

157. Because of Defendants' due process violations, Professor Lamparello has suffered damage. His contract was terminated, and he was demoted to non-tenure-track faculty with no possibility of renewal.

158. Defendants' actions were intentional, willful, and malicious. Even if Professor Lamparello were to recover only nominal damages, he is therefore entitled to punitive damages due to the reprehensible nature of Defendants' conduct.

159. Defendant is also entitled to reinstatement.

**COUNT 3: Breach of Contract**
**(Board of Regents of the University System of Georgia)**

160. Plaintiff here incorporates by reference all preceding paragraphs as if fully set forth in this paragraph.

161. The Board of Regents is the governing authority for the University System of Georgia, which includes Georgia College and State University.

162. The Board of Regents exercises control over Georgia College and State University, including its policies and contracts.

163. Professor Lamparello entered into a contract with Georgia College and State University, an agency of USG, for his employment, first as a non-tenure-track Professor and subsequently as a tenure-track Professor.

164. Each and every contract entered into by Professor Lamparello with Georgia College and State University incorporated by reference the policies, rules, handbooks, manuals, and procedures of the USG and Georgia College and State University.

165. The policies, rules, and procedures of Georgia College and State University form binding contracts. Georgia College and State University were and are bound to follow their own

policies. Georgia College and State University cannot require Professor Lamparello to follow rules which the university, as his employer, violates with impunity.

166. Because USG purports to abide by its obligation to uphold faculty-member constitutional due process rights, it guaranteed due process in its Board of Regents policies, specifically Board of Regents Policy 8.3.9. Thus this policy also became a right guaranteed by contract.

167. Specifically but without limitation, Policy 8.3.9 specified various contractual obligations to follow procedures for the termination of tenure-track faculty.

168. Georgia College and State University breached contract by disregarding its contractual obligations to follow, without limitation, procedures for the termination of tenure-track faculty.

169. Professor Lamparello has been damaged due to his termination.

170. The Constitution of the state of Georgia, § II, ¶ IX addresses sovereign immunity and waiver thereof. Paragraph IX(c) provides: "The state's defense of sovereign immunity is hereby waived as to any action *ex contractu* for the breach of any written contract now existing or hereafter entered into by the state or its departments and agencies."

171. The value of Plaintiff losses under Georgia College and State University's breach of contract exceeds $75,000 in value.

172. The Board of Regents of USG is therefore liable in contract and must pay investor Lamparello all compensatory damages as proved at trial.

**PRAYER FOR RELIEF**

Professor Lamparello prays this Honorable Court for the following relief:

i. Declare Defendants liable in their official and individual capacities for the violation of Professor Lamparello's constitutional right to speak freely on matters of public concern under the First Amendment to the United States Constitution.

ii. Declare Defendants liable for violation of Professor Lamparello's constitutional right to due process under the Fourteenth Amendment to the United States Constitution.

iii. Declare Defendants liable for breach of contract.

iv. Order Defendants to pay Professor Lamparello all compensatory and direct and indirect damages, back pay, and front pay in an amount to be determined at trial.

v. Order, in the alternative, nominal damages.

vi. Order Defendants to pay Professor Lamparello punitive damages.

vii. Enjoin Defendants from violating the First Amendment and Fourteenth Amendment rights of faculty of the Georgia College and State University.

viii. Enjoin Professor Lamparello's termination, Order Defendants to reinstate Professor Lamparello to his tenure-track position, and Enjoin Defendants from further interference with his First and Fourteenth Amendment rights.

ix. Order Defendants to pay Professor Lamparello all reasonable attorney fees and costs under 42 USC § 1988(b).

x. Order such other legal and injunctive relief as the court finds just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**

Respectfully submitted,

Michael Thad Allen
*admitted pro hac vice*
ALLEN HARRIS PLLC
PO Box 404
Quaker Hill, CT 06375
mallen@allenharrislaw.com

Robyn Painter (Bar#110108)
PAINTER LEGAL
1190 W. Druid Hills Dr.
Suite T-90
Atlanta, GA 30329
(404) 317-6132
painterlegal@gmail.com

*For Plaintiff*